IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDY KNIGHT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BARRY CALLEBAUT USA SERVICE | : | NO. 15-6450 |
| COMPANY, INC., et al. | : | |

ORDER AND OPINION

JACOB H. HART                                             DATE:  December 19, 2016
UNITED STATES MAGISTRATE JUDGE

Plaintiff, Randy Knight ("Plaintiff" or "Knight"), filed this action against his former employer, Defendants, Barry Callebut USA Service Company, Inc. and Barry Callebut USA, LLC ("Defendants" or "Barry Callebut") alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., ("ADA") and the Family Medical Leave Act, 29 U.S.C. §§ 2611 et seq. ("FMLA")[1].  Plaintiff filed the Complaint in this action on December 4, 2015. Complaint- Doc. No. 1.  Defendants filed an Answer with Affirmative Defenses on February 2, 2016.  Answer- Doc. No. 6.  Currently pending before this Court is Defendants' Motion for Summary Judgment, which was filed on September 26, 2016.  Doc. No. 19.  Plaintiff has filed a Statement of Material and Disputed Facts, a Response to Defendant's Statement of Material Facts, and a Response to the Motion for Summary Judgment (Docs. No. 25, 26, 27) and Defendants have filed a Reply to Plaintiff's Response (Doc. No. 28).   For the reasons set forth herein this Court will deny Defendants' Motion for Summary Judgment.

---

[1] In the initial Complaint Plaintiff indicated that he planned to amend the Complaint to include causes of action under the Pennsylvania Human Relations Act ("PHRA"), which would mirror his ADA claims, once they were administratively exhausted.  However, he never filed an Amended Complaint.

I.      Factual and Procedural Background

Knight, a 35 year old male, was employed by Defendant, Barry Calebaut, a manufacturer of high-quality cocoa and chocolate products from April 8, 2013 until he was terminated on April 27, 2015. Knight was the overnight Production Supervisor on "B Shift", which meant that he worked from 9:00 pm through 9:00 am Sunday through Tuesday and from 9:00 pm through 3:00 am on Wednesday. Defendant's SUMF at ¶ 4. His direct supervisor was Jack Wyszynski ("Wyszynski"), who worked during the day shift. As Production Supervisor, Plaintiff spent the majority of time overseeing the chocolate and cocoa production at the Eddystone Facility. Id. at ¶ 8. Knight contends that in addition to his written job duties he held daily meetings with employees to review production numbers and downtime, reviewed employee documentation for accuracy, assisted with employee questions, oversaw shipping, and conducted security checks of the perimeter of the building. Id. at ¶ 10.

Plaintiff alleges that he was diagnosed with Chrohn's disease. He was hospitalized twice after experiencing abdominal pain and was treated for bowel obstructions. Doc. No. 25- Ex. L. He claims that he experiences diarrhea multiple times every day. Pl's Dep. at 238:10-11, 241:24-242:4. According to Plaintiff, his abdominal pain and diarrhea began sometime in early 2015. Id. at 244:245:2. Knight claims that due to flare ups of his medical condition, he needed "brief periodic breaks" while he was working to allow him to vomit outside. Plaintiff believed that Defendant's policy, which provided that employees must not "enter the plant with any contagious rashes, foodborne illness or medical condition that may lead to food contamination (for example, diarrhea or vomiting)" prohibited him from being on the plant floor if he was experiencing symptoms including diarrhea. Def's SJ Motion (Doc. 19) Ex. R. He testified that the breaks lasted from ten minutes to one hour and were needed from zero to three times per

shift. Pl's Dep. at 167:7-12, 251:24-252:3, 292:11-14, 296:3-6, 341:16-19. Plaintiff explained that if he went outside for a break, it was because he "had to get away from everybody" and did not want employees to have access to him. Def's SUMF 80. If he began to feel better, he might perform a security check or do paperwork in his car, but if he was not able to perform his duties he did not. Defendant's SUMF 81. Plaintiff testified that he told Wyszynski, Human Resources Manager, Julia Rosati and Site Manager, Jean Marc Desheraud when he vomited. Pl's Dep. at 326:12-327:1. He alleges that he had multiple conversations with Wyszynski and Rosati both in person and over the phone to let them know what was going on. Pl's Dep. at 262:3-17, 269:16-20.

Plaintiff was hospitalized from March 29 to April 1, 2015, with a small bowel obstruction. After being discharged from the hospital, he underwent testing. Plaintiff's wife called and informed Julia Rosati that he would not be at work and that there was a possibility that Plaintiff had Crohn's disease. Rosati Dep. at 35:5-36:10, 36:15-22. After Plaintiff's first hospital stay, on April 6, 2015, Rosati emailed Knight paperwork which she claims related to short term disability and FMLA. Rosati Dep. at 38:18-24, 39:8-12. However, the paperwork provided does not provide any information about FMLA or Plaintiff's rights related to FMLA. In fact, it relates to a third party provider, UNUM for short term disability and above the authorization for medical records specifically states "Not for FMLA Requests". Def's SJ Motion (Doc. No. 19) Ex. T.

On Plaintiff's last day of work, April 22, 2015, he began calling management at 3 am to inform them he needed to go to the Emergency Room, but was unable to reach anyone. Since he did not want to walk off of the job, he waited until Jack arrived at the facility. Pl's Dep. at

246:16-24.  Knight testified that he vomited more than 10 times during that shift.  Since he was unable to reach a supervisor, he sent an email to Wyszynski and Rosati at 7:34 am, which stated:

> I waited as long as I could.  I wanted to at least finish up my shift report so no one was trying to guess as to what happened on my shift.  I wanted to come in and talk to you but you were in a private meeting with Parnell, then you were on the phone when I tried again.  I waited as long as I could.  I am leaving and going straight to the ER from here.  I had severe pains again last night and struggled to make it through the shift, but I did.  I couldn't keep anything down again either and vomited quite a few times, which says that I may have another blockage.  Anyway I am going to the ER I will let you know something as soon as I know.

Plaintiff was in contact with Defendants and notified Rosati when he was discharged from the hospital on April 24, 2015, but she told him not to report to work until Monday morning at 9 am.  When he reported on Monday, April 27, 2015, he met with Rosati, Desheraud, and Wyszynski and was informed that his employment was terminated.  Knight provided medical documentation at the meeting, which showed that he was hospitalized from March 29, 2015 to April 1, 2015, was under a doctor's care April 6 and April 7, 2015, and was hospitalized again from April 22 to April 24, 2015.  However, the decision to terminate him had already been made.  According to Knight's termination letter, he was terminated for theft of time and negligence of not doing his job, not being on the plant floor for extended times during his defined work hours.

Defendants claim that the decision to terminate Plaintiff's employment was not related to the fact that he left his last shift to go to the hospital.  Rosati testified that Knight was fired for job abandonment or negligence, being in his car off of the property and not being on the production floor.  Rosati Dep. at 43:18-22.  Defendants allege that the decision stemmed from a complaint made by an employee after an accident occurred at the plant while Plaintiff was in the hospital on April 22, 2015.  The press operator, Leo Vincente, was injured while the production supervisor position was being filled by Wyszynski because Plaintiff was in the hospital.  According to Defendants, Vincente was able to leave the production floor and reach Wyszynski

4

in his office before losing consciousness. Def's SUMF at ¶¶ 27-31. Defendants assert that following the accident, an employee, George Raymond, approached Rosati and stated that he was glad Wyszynski was there instead of Plaintiff since Plaintiff was frequently gone for long periods of time during his shifts. Id. at ¶¶ 34-36. Defendants allege that the next morning Rosati and Desheraud reviewed video footage of the April 14-15 shift and surrounding shifts worked by Plaintiff. They concluded that there was no justification for the amount of time Plaintiff spent outside of the facility. Id. at ¶¶ 47-55. A different employee had made a complaint about Plaintiff sometimes being unavailable in February of 2015, but Defendants did not talk to Knight or watch surveillance videos at that time. Plaintiff's SUMF (Doc. No. 25) at ¶¶ 141-145.

Plaintiff asserts that he had job duties that require him to be outside of the facility, including monitoring the loading and unloading of trucks and security checks of the perimeter. Id. at ¶¶ 22-42. In addition, on April 13-14, 2015, one of the shifts examined by Defendants on video, Defendants were aware that Plaintiff was absent from the facility because he had reported that his car had been shot and he was reporting it to the police. Id. at ¶ 131. As to his shift on April 14-15, 2015, Plaintiff contends that he was taking breaks due to his medical condition and that the video shows that he was vomiting. Id. at ¶ 132. Finally, as to his shift on April 15-16, Plaintiff asserts that he was working in the R&D lab, which would have been evident from viewing one of the other 96 cameras. Id. at ¶ 134. Defendants did not discipline Knight or allow him to explain why he was outside of the facility before terminating his employment. Id. at ¶ 119. According to Knight, his employment was terminated because of his actual/perceived disabilities and/or in retaliation for requesting reasonable accommodations. Complaint at ¶ 32. He also alleges that he was never properly advised of his rights under the FMLA and was discouraged from applying for leave pursuant to FMLA. Complaint at ¶ 51.

II. Summary Judgment Standard

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. Anderson v. Liberty Lobby, supra at 255; Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett at 323.

III. Discussion

ADA- Discrimination[2]

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) he is disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3)

---

[2] As Plaintiff notes in his response to the motion for summary judgment, Defendant did not move to dismiss Plaintiff's retaliation claim under the ADA. Doc. No. at 11. Instead, Defendant argues that he cannot establish a discrimination or failure to accommodate claim. In order to maintain a retaliation claim under the ADA, Plaintiff does not need to establish that he had any type of qualifying disability. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003), citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 498 (3d Cir. 1997). He must only have a reasonable belief that he was entitled to request the accommodation requested. Id.

he has suffered an adverse employment decision on the basis of that disability. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir.1999). Once Plaintiff has demonstrated a *prima facie* case of discrimination the burden shifts to Defendant to articulate a legitimate business reason for the employment action. Mercy v. SEPTA, 608 Fed. Appx. 60, 64 (3d Cir. 2015). Plaintiff must then demonstrate that the stated reason is merely a pretext for discrimination. Id. at 64-65. In order to establish a claim under the ADA for failure to accommodate, a plaintiff must prove: (1) he is disabled, (2) he is otherwise qualified to perform essential functions of the job, with or without reasonable accommodations by the employer, and (3) defendant refused to provide a proposed reasonable accommodation or failed to engage in an interactive process after plaintiff requested an accommodation, though a reasonable accommodation was possible.[3] Solomon v. School Dist. of Phila, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012).

    Defendants move to dismiss Plaintiff's claim pursuant to the ADA because Plaintiff cannot set forth a *prima facie* case and cannot demonstrate pretext. First, Defendants claim that Plaintiff cannot sustain his claim of ADA discrimination because Knight was never diagnosed with Crohn's disease. To satisfy the requirement of having a "disability," a plaintiff may demonstrate: (1) an actual mental or physical impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) that his employer regarded him as having a disability. Marinelli v. City of Erie, Pa., 216 F.3d 354, 359 (3d Cir.2000).

---

[3] The parties seem to address the ADA Count of Plaintiff's Complaint as alleging three separate claims under the ADA. However, a failure to accommodate claim is not separate from an ADA discrimination claim, but rather failure to accommodate is a theory that may support discrimination. See Solomon v. School Dist. of Phila, 882 F. Supp. 2d 766, 776-77 (E.D. Pa. 2012). An employer's failure to accommodate or failure to engage in the interactive process may be an adverse employment action. Id. at 778. Therefore, there is no need to separately address the other elements of the claim.

Plaintiff testified at his deposition that he suffered from symptoms including diarrhea sometimes multiple times a day, every day for the last year to year and a half.  Plaintiff's Dep. at 238:7-11; 241:19-242:9.  He also complained of severe stomach pain and fatigue associated with dealing with daily activities.  Id. at 239:3-24.  Knight explained that there was pain even without a blockage but the doctor told him that when there is severe pain that he can't get under control he must go to the emergency room because it could be another blockage, which comes with Crohn's disease.  Id. at 240:17-24.  He testified that there were a number of occasions where he got to the point that he could not work and would sit while he decided if he needed to go to the hospital.  He also stated that there were times when he probably should have gone to the hospital but did not.  Id. at 243:8-18.  When discussing the frequency of these breaks, Plaintiff testified that there were a handful of times he just needed to sit down for a few minutes or walk it off,  but there were two times he went to the emergency room.  Id. at 246:6-11.

As Defendants argue, a bald assertion of a disability is not sufficient for a *prima facie* case.  Plaintiff must point to factual evidence.  See Larkin v. Methacton Sch. Dist., 773 F. Supp. 2d 508, 526 (E.D. Pa. 2011).  Defendants focus on Plaintiff's lack of an official diagnosis of Crohn's disease.  We agree with Defendants that while Plaintiff points to certain notes as proof of a diagnosis, it is clear that the records list Crohn's disease as a "differential diagnosis", meaning that it was being considered, but not confirmed.  See Doc. No. 25- Ex L.  The records state that the doctors had been unable to identify the source of his symptoms and suspect underlying pathology.  The differential diagnosis includes "Crohn's disease versus primary neoplasm of the small bowel, for instance carcinoid tumor or GIST."  Doc. No. 25- Ex. L. at 11.  However, the medical records and hospitalizations confirm that Plaintiff was treated for abdominal pain and bowel blockages, symptoms consistent with Crohn's disease.  Considering

Plaintiff's testimony and the evidence in favor of the non-moving party, whether or not a doctor officially diagnosed him with Crohn's disease, Plaintiff alleges and was treated and hospitalized for symptoms which allegedly impacted life activities including his ability to function and even think. Therefore, there is at least a triable factual question as to whether Plaintiff suffered from a disability or was regarded as having such a disability. See Williams v. Phila. Hosing Auth. Police Dept., 380 F.3d 751, 763 (3d Cir. 2004 (holding that the question of whether an individual is substantially limited in a major life activity is a question of fact).

Second, Defendants argue that Plaintiff cannot sustain an ADA claim because Defendants were not aware of his condition. Defendants claim that Knight never requested the accommodation at issue here, periodic breaks to rest in his car, and that Barry Cellebaut never had knowledge of any alleged disability. Defendants assert that they only knew that Plaintiff had been hospitalized twice (March 29-April 1, 2015 and April 22-24, 2015) and released to return to work full duty.

"The employer must have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." Colwell v. Rite Aid Corp., 602 F.3d 495, 506 (3d Cir. 2010). Although Defendants acknowledge that Plaintiff's wife was in contact with them while Knight was hospitalized the first time and that she informed them he was being tested for Crohn's disease, they claim in their statement of facts that Plaintiff admits that he never informed them that he was vomiting at work or needed breaks. Def's SUMF (Doc. 19-2) at ¶ 85. Defendants note Knight's testimony that he was unable to reach them when he needed a break. However, contrary to Defendants' claim, Plaintiff testified at his deposition that he had multiple conversations with Wyszynski, his direct supervisor and

9

Rosati, the Human Resources Manager, both over the phone and in person to let them know "what was going on". Pl's Dep. (Doc. No. 19-4) at 262:4-17. He was unable to recall dates of the conversations and was unable to state whether or not the conversations occurred prior to March 29th, but was certain that he had multiple conversations with them regarding his condition. Id. at 266:1-14. Plaintiff was unable to give a definite number, but stated that he had a few conversations with Wyszynski and a few conversations with Rosati and his wife also had also had a few conversations with them during his hospital stays. Id. at 269:13-20.

Knight testified that his wife originally contacted Wyszinski, but he instructed her to contact Rosati. Id. at 270:16-23. During his first hospitalization, Knight's wife told Rosati what tests the doctors were conducting and had contact with her almost every day. Id. at 270:12-15. In addition to talking to Wyszynski and Rosati regarding his condition, Plaintiff testified that he had also informed his key operators about his condition and symptoms when he had flare-ups and needed to step outside. Id. at 267:13-22. He did not give the key operators details regarding his condition, but told them he had stomach issues and needed to step outside for a few minutes so they would know where he was. Id. at 268:15-19. Furthermore, Rosati admits she was aware that Plaintiff was having stomach pains and that he was in and out of the hospital. Rosati Dep. at 34:8-19. She also testified that on March 29, 2015, she had a conversation with Plaintiff's wife and was aware that he was being tested for Crohn's disease. Id. at 35:1-22. She testified however that Plaintiff did not request breaks due to his stomach pains and admits that no accommodations were offered to him because he was returning to full duty. Id. at 38:6-17. Knight testified that a few weeks before he was fired, his wife had discussions with Rosati about Plaintiff's concern of losing his job because of his hospital stay and Rosati assured her that everything was going to be fine. Pl's Dep at 271:23-272:6.

The email Plaintiff sent when he left to go to the ER on his last date on the job stated he was having severe pain and uncontrolled vomiting "again", certainly inferring that this was not the first time he was informing them of these issues. Similarly, immediately after receiving Knight's email stating that he was going to the hospital, Rosati sent an email inquiring as to whether Knight had been approved for FMLA leave, stating "Just curious…I have a supervisor who keeps going 'out' because he is sick". Pl's SMF (Doc. No. 25) at ¶¶ 149-150 citing Ex. V.

Accepting Plaintiff's testimony as true, Defendants were at least aware of his health condition. While the evidence is disputed and it is unclear what specific requests for accommodations were made during these conversations, Plaintiff claims he had conversations with Julia Rosati, Jack Wyszynski and Jean-Marc Desheraud about his medical conditions. Doc. 27 at 31 (citing Pl's SMF at ¶ 74). Furthermore, as Plaintiff asserts, a request for medical leave may also be a request for a reasonable accommodation under the ADA. See Bernhard v. Brown & Brown of Lehigh Valley, Inc., 720 F. Supp. 2d 694, 703 (E.D. Pa. 2010) (leave of absence for medical treatment could constitute a reasonable accommodation under the ADA). Since it is undisputed that Plaintiff requested leave for medical treatment when being admitted to the hospital, there is at least a question of material fact sufficient to survive summary judgment as to whether Knight made a request for a reasonable accommodation under the ADA.

Next, Defendants claim that Plaintiff is not a qualified individual with a disability because he cannot establish that he was qualified to perform the essential functions of his position with or without reasonable accommodation. As Defendants allege, if the accommodation would prevent Plaintiff from performing the essential functions of his job, relief is not warranted. See Kiburz v. England, 361 Fed. Appx. 326, 335 (3d Cir. 2010) (finding a request to work from home was not reasonable where employee had to be in the office to

11

perform essential functions of the job). While constant breaks outside of the facility would not have been a reasonable accommodation, less frequent breaks or coverage on a temporary basis may have been a reasonable accommodation. See Johnson v. McGraw-Hill Comp., 451 F. Supp. 2d 681, 706 (W.D. Pa. 2006) ("Under certain circumstances, an accommodation that is reasonable if deployed on a permanent basis may nevertheless be deemed reasonable if required only on a temporary basis"). According to Plaintiff, he was performing part of his job duties even when he was outside of the facility and was always in contact with everyone inside the facility. He explained that when he left the plant floor he still had his radio and remained in constant contact with everyone in the facility. Id. at 268:19-23. The record has very conflicting accounts as to what duties were included as part of his job, creating a dispute as to facts material to this issue, as well. In addition, a reasonable accommodation may have been temporary or intermittent leave during the period of time that Plaintiff was experiencing these flare-ups.

As there is at least sufficient evidence to get past summary judgment on Plaintiff's *prima facie* case, Defendants assert that there was a legitimate reason for terminating Plaintiff's employment and that Knight cannot establish that the reasons are pretext. While Defendants state that "there is no evidence at all that Mr. Knight's March 29-April 7 absence for medical care and his leaving early on April 7 and April 22 because he was ill played any role in the decision to terminate his employment", the fact that he was terminated immediately after leaving his shift early is sufficient to create a factual question of pretext (as set forth further below). See Doc. No. 19 at 13. Therefore, Plaintiff's claim for discrimination under the ADA will survive summary judgment.

Interference with Plaintiff's FMLA Rights

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" guaranteed by the Act. 29 U.S.C. § 2615(a)(1). In order to establish a claim of FMLA interference, Plaintiff must demonstrate: (1) that he was entitled to benefits under the FMLA and (2) Defendant denied those benefits. Budhun v. Reading Hosp. & Medical Center, 765 F.3d 245, 252 (3d Cir. 2014). An employee is not required to expressly invoke FMLA, but must simply give the employer notice of the request for leave and state a qualifying reason for the leave. 29 C.F.R. § 825.302(c). "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1).

Plaintiff claims that he was not advised of his rights under FMLA, but was instead provided with paperwork from a third-party insurance provider. He also alleges that he did not complete the paperwork because when his wife expressed concern about how to complete it since he had not received an official diagnosis, Rosati told them not to worry about it. Defendants assert that Knight cannot demonstrate any prejudice as a result of any alleged interference because his leave was in fact classified as FMLA leave.

In response, Plaintiff claims Defendants interfered with his right to FMLA because he was not informed of his right to intermittent FMLA leave and he was prejudiced as a result. He claims that if he had known of this right he could have planned his leave and would not have felt obligated to stay at Defendants' facility when his condition flared up. In the alternative, Plaintiff argues that in April after his visit to the emergency room he could have scheduled a block of

leave to treat his condition. He claims that it would have prevented him from being at work and needing breaks for vomiting, which he believes was ultimately the cause of his employment being terminated.

Defendants argue that Knight cannot establish that he was entitled to intermittent leave or that he was prejudiced as a result of any FMLA notice violation. As Defendants argue, unscheduled or unpredictable breaks at a moment's notice for the rest of Plaintiff's life would not have been required under the FMLA. See Hayduk v. City of Johnstown, 580 F. Supp. 2d 429, 545 (W.D. Pa. 2008). However, a scheduled block of time for treatment and testing or intermittent leave may have been permitted. An employer's failure to advise an employee of FMLA rights can constitute an interference of the employee's FMLA rights. Ragsdale v. Wolvernie World Wide, Inc., 535 U.S. 81, 88-89 (2002); Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004). In Conoshenti, the Third Circuit found that a failure of information which does not allow an employee to structure FMLA leave and make informed decisions can constitute interference. Conoshenti, 364 F.3d at 144-45. Therefore, regardless of the fact that the time Knight was hospitalized was ultimately classified as FMLA leave does not change the fact that when considering the facts in light of the non-moving party, Plaintiff was deprived of the right to make informed decisions and to plan accordingly when structuring his leave because he was not advised of his rights to twelve weeks or intermittent periods of job protected leave. Id. at 145-46. Therefore, this claim must also survive summary judgment.

Defendants further argue that Plaintiff was not entitled to FMLA leave because his medical records discharging him from the hospital released him for full duty. However, since he was unaware of his FMLA rights, he was not given the opportunity to obtain appropriate certifications. As Plaintiff asserts, his condition had flared up in March and April of 2015, which

is evidence by two emergency room visits and medical testing. If he had been informed of his right to take leave after his March 29th emergency room visit, he may have been able to schedule a block of leave during this time period and then would not have needed the breaks outside of the facility to deal with his condition. He also claims that this this would have eliminated his request for leave to go to the hospital two days prior to his termination. In addition to the lack of proper notice, Plaintiff also alleges that Defendants interfered with his rights by terminating him prior to him being granted job protected leave.

FMLA Retaliation:

In order to establish a claim for retaliation, an employee must demonstrate that "(1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the plaintiff's exercise of his or her FMLA rights." Erdman v. Nationwide Ins. Co, 582 F.3d 500, 509 (3d Cir. 2009). Once the Plaintiff shows a *prima facie* case, the burden shifts to the Defendants to provide evidence of a legitimate reason for the adverse employment action. Budhun v. Reading Hosp. and Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Then, once the employer sets forth a legitimate reason, the employee must point to some evidence that the employer's reasons for the adverse action are pretextual. Id. (citing Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012)).

As to the first element, eligibility of FMLA rights or invocation of those rights, there is at least a factual question. Plaintiff states that by identifying that he needed to take time off to treat his condition, it was both a request for accommodation under the ADA and a request for leave under the FMLA. Although Knight never completed FMLA paperwork, he contends that his email stating that he was going to the emergency room was a request for eligible leave.

Furthermore, Defendants state that the leave he took was actually classified as FMLA leave. Plaintiff asserts that Defendants cannot argue both that he is unable to prove a retaliation claim because he never completed the paperwork and that his rights were not interfered with because they classified his absences as FMLA qualifying. They are attempting to argue that he did not engage in FMLA protected activity, but at the same time classified the absences as FMLA qualifying. We agree that the fact that Defendants classified Plaintiff's leave as FMLA is sufficient for purposes of setting forth a *prima facie* case that his FMLA rights had been invoked to allow the retaliation claim to survive summary judgment. As to the second element, since Knight's employment was terminated he clearly can demonstrate an adverse employment action.

 Plaintiff argues that a reasonable jury could conclude that there was animus towards Plaintiff's requested accommodation since he was terminated so quickly after making the request for leave. In order to demonstrate a causal connection, a plaintiff must show "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir.2007). Temporal proximity is generally one factor in determining whether there was retaliation, but may alone be sufficient where the proximity is so suggestive. See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (temporal proximity between the protected activity and the termination is itself sufficient to establish causal link); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding sufficient evidence of causation where adverse action was two days after the protected activity). The fact that Knight's employment was terminated immediately upon his return and the decision was actually made prior to his return is evidence of causation. See id.

The fact that Plaintiff was fired two days following his request for leave (which was classified as FMLA leave) can alone be sufficient to establish causation and can simultaneously serve as evidence of pretext. Jalil, 873 F.2d at 708. As Knight argues, his earlier hospitalization and need for breaks was also all within a month before he was terminated, creating a clear inference of retaliation sufficient to survive summary judgment. In addition to temporal proximity, Plaintiff argues that Defendants' management's refusal to answer his calls when he needed to leave work and Julia Rosati's refusal to remedy the situation shows antagonism against him for requesting leave. It is undisputed that Plaintiff had no discipline issues during his employment. Rosati Dep. at 41:9-11.

Defendants set forth theft of time as the reason that Knight was fired days after leaving early to go to the emergency. Defendants allege that they viewed surveillance videos (from two out of 96 cameras) showing Knight was outside of the facility for extensive times during his shifts. According to Defendants, there was an accident at the Eddystone facility on April 22, 2015, while Plaintiff was in the hospital. An employee, Mr. Raymond reported to Rosati that he was glad that Wyszynski was covering for Plaintiff that night because Plaintiff was often hard to find. Defendants allege that it was as a result of this complaint that they looked into Plaintiff's whereabouts on a date mentioned by Raymond, April 14th to 15th and surrounding shifts.

While Defendants claim they did not know what he was doing outside, Plaintiff maintains that many of his job duties were performed outside of the facility. As set forth above, he also alleges that Defendants were aware of his need for breaks outside of the facility. One of the videos in question was from Plaintiff's April 14th to April 15th shift, which was a day he was vomiting and was unable to reach a supervisor and another was a date when Defendants allegedly knew he was reporting an incident regarding his car to the police. Plaintiff contends

that Defendants' alleged reasoning for terminating his employment is pretextual. For purposes of summary judgment, there is a genuine issue of material fact since Plaintiff has presented evidence disputing the circumstances resulting in the adverse employment action.

Plaintiff also notes that Defendants provided inconsistent testimony regarding his termination. As Plaintiff provides, the testimony was inconsistent as to who was actually involved in the decision to terminate him and as to whether his performance was an issue. Rosati testified at her deposition that the decision was made only by herself and the plant manager, Jean-Marc DeSheraud. Rosati Dep. at 42:8-15. However, according to Desheraud, Wyszynski was also involved in the decision to terminate Knight. Desheraud Dep. at 61:1-7; 62:7-15. The testimony regarding the timeline and notes from the videos was also inconsistent. As Plaintiff notes, Rosati testified that the timelines were used in making the decision to terminate Knight and she showed them to Desheraud prior to making the decision to terminate him. Rosati Dep. at 42:16-24. Contrary to her testimony, Desheraud testified that Rosati did not have the timeline at the time they made the decision to terminate Plaintiff and clearly stated that he did not see the videos until after the lawsuit was filed. Desheraud also referred to Knight's "declining performance", which was not mentioned by the others. Desheraud Dep. at 65:17-22; 67:15-68:24.

Plaintiff was not given an opportunity to explain his absence from the plant floor. Defendants admit that they never asked Plaintiff why he was in his car, but made the decision to fire him after he left to go to the emergency room and after watching brief portions of videos showing that he went to his car or was not on the plant floor. Desheraud testified that he did not watch the full video to see whether Plaintiff vomited and that the decision to terminate him was made prior to Knight returning to work on the Monday after being released from the hospital.

Desheraud Dep. at 77:18-78:16; 81:3-82:1. Given the factual disputes, this FMLA claim must also survive summary judgment.

    III.    <u>Conclusion</u>

In accordance with the above discussion, Defendants' motion will be denied. For the reasons set forth above, I now enter the following: